UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
DANIELLE G., A MINOR, BY AND   |
THROUGH HER PARENTS AND NEXT   |
FRIENDS, ALEXANDER AND LAURA G. |
  |
        Plaintiffs,   |
  |   <u>NOT FOR PUBLICATION</u>
     -against-   |   **MEMORANDUM & ORDER**
  |
NEW YORK CITY DEPARTMENT OF   |   06-CV-2152 (CBA)
EDUCATION, JOEL KLEIN,   |
CHANCELLOR OF NEW YORK CITY   |
SCHOOLS   |
  |
       Defendants.   |
-------------------------------------------------------X
AMON, UNITED STATES DISTRICT JUDGE:

      Plaintiffs Alexander and Laura G. have brought an action on behalf of their daughter,

Danielle G. ("Danielle"), against the New York City Department of Education, pursuant to the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2). They appeal a

New York State Review Officer's decision to uphold a determination that Danielle's 2005

Individualized Education Plan ("IEP") was reasonably calculated to provide her with a free

appropriate public education. Plaintiffs and defendants have cross-moved for summary

judgment. For the foregoing reasons, the Court grants in part and denies in part plaintiffs' and

defendants' motions for summary judgment.

**I.      Background**

      Danielle is a student who was diagnosed with Autism Spectrum Disorder in January

2000. Defendant New York City Department of Education ("NYCDOE") is responsible for the

operation and management of Danielle's school district. When Danielle turned three years old,

her school district's Committee on Preschool Special Education ("CPSE") recommended 25-27 hours per week of Special Education Itinerant Teacher ("SEIT") services, five hours per week of speech therapy, as well as occupational and physical therapy. Six months after the CPSE's recommendation, Danielle's parents enrolled her in a half-day private parochial pre-school program, where she was accompanied by a SEIT. In October 2001, the CPSE developed an IEP for the 2001-2002 school year which increased Danielle's SEIT services to thirty-two hours per week and continued all other related services on a 12-month basis. This was the last IEP agreed upon by Danielle's parents and the school district.

For the 2002-2003 school year, to prepare for Danielle's transition to kindergarten, the school district's Committee on Special Education ("CSE") developed an IEP that classified her as an emotionally disturbed child, recommended that she be placed in a collaborative team teaching class, decreased her speech and physical therapy, and shortened her program from twelve months to ten months of services. Danielle's parents requested an impartial hearing to challenge the CSE's recommendations. During her parents' challenge and throughout the 2002-2003 school year, Danielle continued to receive SEIT and related services, as recommended in the October 2001 IEP.

The following year, the CSE developed an IEP for the 2003-2004 school year that reclassified Danielle as autistic, but continued to recommend collaborative team teaching, a reduction in speech therapy, and a reduction in her program from twelve to ten months of services. Danielle's parents again requested an impartial hearing to challenge the recommendations, which resulted in a stipulated settlement that allowed Danielle to continue receiving the services as recommended in the 2001 IEP.

In advance of the 2004-2005 school year, during which Danielle would be starting the second grade, the CSE recommended for Danielle be provided with collaborative team teaching, and cessation of SEIT services. The CSE also advised Danielle's parents that evaluations need to be performed to assess her current status. Danielle's parents requested an impartial hearing in September 2004 to challenge the CSE's recommendations and to discuss what evaluations were needed. The impartial hearing held in November 2004 resulted in an agreement to continue the services from the 2001 IEP and to conduct evaluations of Danielle.

The CSE reconvened on February 18, 2005, with the district representatives, evaluators including a special education teacher, a social worker, a neuropsychologist, a psychologist, and a speech and language therapist. Danielle's mother was present and her SEIT and general education teacher participated by phone. Danielle's mother, Mrs. G, claims she was told to wait a half-hour before she joined the meeting, while the district representatives and evaluators met without her in a "pre-conference." At the state hearing below, Mrs. G testified that she felt everyone understood Danielle's needs during the CSE meeting but was surprised at the end of the meeting when the CSE recommended the termination of SEIT services and the implementation of paraprofessional services. The recommendations contained in the February 18, 2005 IEP ("2005 IEP"), now at issue, included Danielle's continued classification as a child with autism; placement in a general education classroom; individual occupational therapy, three times a week for 30 minutes; individual physical therapy, two times a week for 30 minutes; individual speech and language therapy two times per week for 30 minutes and once a week in a group of three-to- one; counseling once a week in a group of three-to-one; and the services of a full time one-to-one behavior management paraprofessional to provide refocusing and

redirection throughout the day. These services were based on a 10 month program, rather than the 12 months of service Danielle had been receiving.

Plaintiffs requested an impartial hearing on March 10, 2005, to challenge the recommendations. They argued that the development of the IEP was procedurally flawed, and that its substantive provisions failed to provide Danielle with a "free appropriate public education" ("FAPE") as required by IDEA. See 20 U.S.C. § 1412(a)(1)(A).

### A.      Impartial Hearing Officer's Decision

Danielle's hearing took place on a series of six days during May, June, July, and August of 2005. On September 19, 2005, an Impartial Hearing Officer ("IHO") issued a decision finding that the IEP was deficient only with respect to the speech and language therapy recommendations, and dismissed the other issues plaintiffs raised.

In its decision, the IHO addressed each of the plaintiffs' contentions. The IHO concluded that the development of the IEP was consistent with due process, and that although some of review team convened prior to the beginning of the review, nothing in the record suggested that they did not consider all the information provided. (See IHO Findings of Fact and Decision at 26.) The IHO also found that the school district had sustained its burden to establish that a full-time behavior management paraprofessional was appropriate to meet Danielle's needs, noting that the record established Danielle functions at or above grade level in academic testing. Danielle's organizational, refocusing, and redirecting needs could be adequately addressed by the paraprofessional, according to the IHO's findings. (Id. at 27-29.) Additionally, the IHO determined that a transition plan was unnecessary because the SEIT services already being provided to Danielle constitute transitional services. (Id. at 27.) The IHO further concluded that

4

parental counseling and training were not required to be detailed in the IEP, and that the CSE was not required to conduct a functional behavioral assessment ("FBA") of Danielle before formulating her IEP. (Id. at 29.)  The IHO found that the IEP's provisions for speech and language therapy were inadequate and ordered additional services to be provided.  (Id. at 30.)

**B.      State Review Officer's Decision**

In October 2005, plaintiffs appealed the IHO's decision.  On February 8, 2006, a State Review Officer ("SRO") upheld the IHO's determination that Danielle's 2005 IEP provided her with a FAPE under 20 U.S.C. § 1412(a)(1)(A). The SRO concurred with the findings of the IHO and found that a full-time behavior management paraprofessional was adequate to meet Danielle's needs; transitional services were not necessary because the record supported a finding that Danielle's current SEIT had provided her with transitional assistance; an FBA of Danielle was not necessary based on her ability to refocus and redirect her attention; 12 month extended services were not warranted because there was no likelihood of substantial regress in the summer months; the IEP accurately identified Danielle's needs and established appropriate goals; the IEP was not required to cover Danielle's tantrumming behavior; and predetermination of the recommendations made at the February 18, 2005 CSE review did not occur.  (See SRO Decision at 9-13.)

**C.      The Instant Case**

Plaintiffs filed a timely complaint in this Court on May 9, 2006, appealing the decision of the SRO.  Plaintiffs allege that the school district's 2005 IEP fails to provide Danielle with a FAPE, in violation of 20 U.S.C. § 1415(i)(2); 42 U.S.C. § 1983; Article 89 of the New York Education Law; 42 U.S.C. § 12132 (American with Disabilities Act),  and 29 U.S.C. § 794

(Section 504 of the Rehabilitation Act of 1973). Specifically, they appeal the findings of the SRO, arguing that (1) the 2005 IEP was predetermined, impermissibly denying Danielle's parents an opportunity for meaningful participation; (2) the 2005 IEP was inadequate because it failed to provide Danielle with SEIT services; (3) the 2005 IEP was required to include a transition plan for Danielle; (4) the SRO employed the wrong standard in determining whether to conduct an FBA and ignored evidence suggesting one was appropriate; (5) the 2005 IEP did not address Danielle's organizational skills deficits, toileting needs, and tantrumming, and failed to include methods of measurement, as required by law; (6) the SRO failed to consider evidence indicating Danielle requires a twelve month program of services and; (7) the 2005 IEP failed to include parental counseling and training services, and the defendants failed to provide them in the past. Plaintiffs seek a declaratory judgment reversing the SRO's decision and holding that the 2005 IEP deprived Danielle of a FAPE. They also seek an order requiring that defendants provide an appropriate IEP for Danielle, which would include a transition plan for Danielle to continue special education services with a gradual reduction in SEIT services and an increase in paraprofessional services. Plaintiffs also seek a behavioral intervention plan based on an FBA of Danielle.[1]

---

[1] Since the filing of reply memoranda on these motions, Danielle has been re-evaluated by her school district's CSE. Evaluations conducted in April of 2007 indicate that, as previously documented, Danielle is at or above great level in all academic areas and demonstrates high intelligence. She scored extremely low, however, on portions of her an Adaptive Behavior Assessment test.

On May 4, 2007, the CSE proposed a new, 2007 IEP that provides for conditions different than those provided for in the 2005 IEP challenged in the instant case. The 2007 IEP recommends that Danielle continue the services in the February 18, 2005 IEP and added a provision that she be placed in a Collaborative Team Teaching Class, which contains a full time special education teacher. The 2007 IEP also lists organization skills as an area of academic

**II.     Statutory Framework and Standard of Review**

Under the IDEA, states receiving federal funds are required to provide "all children with disabilities" a "free appropriate public education."  20 U.S.C. § 1412(a)(1)(A).  To fulfill IDEA's requirements, a school district's program must provide "special education and related services tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'"  Walczack v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)).

These services are administered pursuant to an IEP, which a school district must provide annually.  20 U.S.C. § 1414(d).  The IEP is the "'centerpiece' of the IDEA's education delivery system."  Murphy v. Arlington Cent. Sch. Dist. Bd. of Ed., 297 F.3d 195, 197 (2d Cir 2002) (quoting Honig v. Doe, 484 U.S. 305, 311 (1988)); see 20 U.S.C. § 1414(d) (defining and describing the development, review, and revision of an IEP)).  "The IEP, the result of collaborations between parents, educators, and representatives of the school district, 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'"  Id.

New York state has designated responsibility for developing appropriate IEPs to local CSEs appointed by school districts.  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007).  A CSE is required to consider four factors in developing a child's IEP: (1) academic achievement and learning characteristics; (2) social development; (3) physical

---

need and contains goals for that area.  By order dated February 20, 2008 the Court accepted the 2007 IEP and Evaluation into evidence in this case; the Court notes, however, that the relevance of this additional evidence is limited, as the 2005 IEP is at issue in this case.

development; (4) managerial or behavioral needs.  See N.Y. Comp. Codes R. & Regs. [hereinafter "N.Y.C.C.R.R."] tit. 8, § 200.1(ww)(3)(i).  The CSE must also consider the IDEA's strong preference for "mainstreaming" or "educating children with disabilities "[t]o the maximum extent possible with their non-disabled peers."  20 U.S.C. § 1412(a)(5); see Gagliardo, 489 F.3d at 108.  The statute requires that "special education and related services [to] be provided in the least restrictive setting consistent with a child's needs."  Lillbask v. Conn. Dep't of Educ., 397 F.3d 77, 81 (2d Cir. 2005).

"IDEA also provides a variety of 'procedural safeguards with respect to the provision of free appropriate public education' by school districts."  Mackey v. Bd. of Educ., 386 F.3d at 160 (quoting 20 U.S.C. § 1415(a)).  If a parent disagrees with a school district's proposed IEP they may challenge it in an "impartial due process hearing" before an IHO appointed by the board of education.  20 U.S.C. § 1415(f). The IHO's decision may be appealed to an SRO.  See  20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2).  The SRO's decision may be challenged in state or federal court.  20 U.S.C. § 1415(i)(2)(A).

IDEA actions in federal court generally are resolved by summary judgment. See, e.g., Thies v. New York City Bd. of Educ., No. 07 Civ. 2000, 2008 WL 344728, at *2 (S.D.N.Y. Feb. 4, 2008); J.R. v. Bd. of Educ. of City of Rye Sch. Dist., 345 F.Supp. 2d 386, 394 (S.D.N.Y. 2004).  In assessing whether a proposed IEP is inadequate to afford a child and appropriate public education, a court must first consider the state's compliance with the procedures set forth in IDEA.  See Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005) (citing Walczak v. Florida Union Free Sch. Dist., 142 F.2d 119, 129).  Second, a court considers whether the IEP developed through the IDEA's procedures is "reasonably calculated to enable

the child to receive educational benefits.  Id.

When reviewing IDEA petitions, district courts must engage in an independent review of the administrative record and make a determination based on the "preponderance of the evidence developed at the administrative proceedings and any further evidence presented by the parties." Walczak, 142 F.3d at 122-23 (citing 20 U.S.C. § 1415(e)(2)); see Gagliardo, 489 F.3d at 112 (stating that federal courts must review the administrative proceedings under a preponderance of the evidence standard).  In order for a district court to conduct an independent review, it must examine the record for "objective evidence" that indicates "whether the child is likely to make progress or regress under the proposed plan."  Gagliardo, 489 F.3d at 113.

At the same time, the role of the federal courts in reviewing state educational decisions under IDEA is "circumscribed."  Gagliardo, 489 F.3d at 112 (quoting Muller v. Comm. on Special Educ., 145 F.3d 95, 101 (2d Cir. 1998)).  District court review of state decisions "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  Rowley, 458 U.S. at 206.  Federal courts reviewing administrative decisions must give "due weight" to the state proceedings below "mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  M.S. ex rel. S.S. v. Bd. of Educ. of the City Sch. Dist. of the City of Yonkers, 231 F.3d 96, 102 (2d Cir. 2000) (citation omitted); see also Walczak, 142 F.3d at 129 ("Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful.").  This "due weight" is not implicated with respect to issues of law, such as "the proper interpretation of the federal statute and its requirements."  Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1122 (2d Cir. 1997).

## III.    Analysis

Plaintiffs raise one procedural and six substantive challenges to the findings of the SRO and the adequacy of Danielle's 2005 IEP.  They assert that the 2005 IEP deprives Danielle of a FAPE in violation of 20 U.S.C. § 1412(a)(1)(A).  In response, the defendants contend that Danielle's 2005 IEP is procedurally and substantively sound and complies with applicable state and federal laws.  The parties' arguments are considered below.[2]

### A.    Compliance with IDEA's Procedural Requirements

Plaintiffs first raise a procedural challenge to the adequacy of Danielle's 2005 IEP, contending that the result of the review was pre-determined and Danielle's parents were denied the opportunity for meaningful participation. The plaintiffs' claim centers on a "pre-conference" by defendants' representatives that took place before the February 18, 2005 CSE meeting. Danielle's mother was asked to wait outside for a half-hour before joining the meeting.  During that half-hour, plaintiffs contend that CSE representatives determined their recommendations for Danielle's 2005 IEP.  To support this claim, plaintiffs point to testimony from Danielle's speech therapist indicating that the recommendations were decided at the pre-conference; the CSE's recommendation at the end of the meeting to terminate SEIT services and to utilize a paraprofessional; the comment made to Danielle's mother by the district's representatives that they needed to conduct evaluations on Danielle because her services were so costly; and allegations that Mrs. G only had limited participation at the meeting.

The SRO held, and defendants respond, that the pre-conference did not prevent CSE members from considering Danielle's mother's input in developing recommendations for

---

[2]    The Court notes that review of these issues was made particularly difficult by the City's failure to cite to the underlying record in its papers.

Danielle's IEP. The SRO found that because Mrs. G was present and participated throughout the discussion of Danielle's evaluation, she had the opportunity to meaningfully contribute during the meeting. Danielle's SEIT and general education teacher were also present during the discussion by telephone. Additionally, Mrs. G indicated she had been pleased with the CSE's knowledge of Danielle's needs during the meeting, which was why she was surprised by the committee's recommendations. The SRO concluded that Mrs. G meaningfully participated in the development of the 2005 IEP, and the pre-conference did not constitute pre-determination.

Based on a review of the record below and the governing case law in this Circuit, the Court concludes that the CSE's pre-conference to discuss Danielle's case did not deprive Danielle's parents of meaningful participation in the formation of her IEP. The IDEA requires "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent evaluation of the child." 20 U.S.C. § 1415(b)(1). The regulations governing parental participation provide that "[e]ach public agency shall take steps to ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate." 34 C.F.R. § 300.345(a). In Cerra v. Pawling Central School District, 427 F.3d 186 (2d Cir. 2005), the Second Circuit considered what type of parental participation is required by IDEA Section 1415(b)(1) and its regulations. In that case, it concluded that a school district fulfilled the IDEA's procedural obligations because the parents participated in CSE meetings and were frequently consulted for input about the proposed plan. The Circuit noted that the relevant inquiry is whether there is "a full

discussion with the child's parents, before the child's IEP is finalized, regarding drafted content and the child's needs and the services to be provided to meet those needs." Id. at 193 (citing 34 C.F.R. § 300, App. A-Notice of Interpretation).

The record does not support a finding that Danielle's educational needs were pre-determined. Mrs. G was present for the February 18, 2005 meeting and had the opportunity to participate meaningfully in the discussions. The record includes testimony from witnesses, credited by both the IHO and SRO, that Mrs. G did not volunteer information during the IEP meeting and referenced a need to confer with her lawyer in response to questions. (Tr. 221.) Although Mrs. G was under no obligation to make any statements during the IEP meeting, her lack of participation does not suggest that she was denied an opportunity to participate in Danielle's IEP formulation.

Plaintiffs rely heavily on testimony from the speech therapist who evaluated Danielle, in which she stated that the CSE representatives discussed the recommendations they would make during the pre-conference. Although CSE representatives may have conferred on recommendations prior to the meeting with Danielle's mother and teachers, the transcript does not demonstrate that this pre-conference resulted in unalterable decisions or otherwise hindered the participation of Danielle's mother in the IEP formation. The defendants' speech therapist testified that the pre-conference discussion did not result in final recommendations, and that recommendations may have changed based on information shared at the meeting. (Tr. 198-99.) Other witnesses similarly testified that the discussions at the pre-conference did not result in final determinations. (See Tr. 223.) Procedural flaws that result in the loss of educational opportunity, or that seriously infringe the parents' opportunity to participate in the IEP

formulation process, result in the denial of a FAPE; given the testimony described above, the record in this case does not evidence these kinds of procedural deficiencies. See, e.g. A.E. v. Westport Bd. of Educ., 463 F.Supp. 2d 208, 216 (D. Conn. 2006).

Accordingly, plaintiffs' procedural claim is dismissed.

**B.     Substantive Adequacy of IEP**

A school district complies with IDEA's substantive requirements when a student's IEP is "reasonably calculated to enable the child to receive educational benefit[s]." Rowley, 458 U.S. at 207; see also Cerra 427 F.3d at 194.  A school need not "provide the optimal level of services, or even a level that would confer additional benefits; the IDEA requires only that student receive a "basic floor of opportunity." Cerra 427 F.3d at 195 (citing Rowley, 458 U.S. at 201; Carlisle Area Sch. v. Scott P., 62 F.3d 520, 534 (3d Cir. 1995)) .  A school district will fulfill its substantive obligations under the IDEA if the student is likely to make progress, not regress, under his IEP, and if the IEP affords the student with an opportunity "greater than mere trivial advancement." Gagliardo, 489 F.3d at 113 (quoting Walczak, 142 F.3d at 130).  The Second Circuit has noted that, "[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." Cerra, 427 F.3d at 195.

 In challenging the substantive adequacy of Danielle's 2005 IEP, plaintiffs contend that (1) the IEP failed to provide for needed SEIT services; (2) the IEP impermissibly lacks a transition plan for Danielle; (3) the record supports a finding that a FBA of Danielle is required; (4) the IEP did not address and set goals in key areas of deficiency, including organizational skills, toileting needs, and tantrumming; (5) the SRO failed to consider evidence indicating

Danielle requires a twelve month program of services and; (6) the IEP failed to include parental counseling and training services. The Court considers each of plaintiffs' contentions below.

**(1)      Specialized Instructional Services**

Plaintiffs argue that the 2005 IEP failed to address Danielle's need for SEIT services by proposing an end to all SEIT assistance and placing Danielle in a mainstream classroom with the assistance of a full-time paraprofessional. Plaintiffs argue that the SRO incorrectly concluded a paraprofessional was sufficient to address Danielle's needs and further contend that if paraprofessional services are utilized, those services should be gradually increased under the supervision of an SEIT. Although the SRO found, and defendants argue, that an SEIT was unnecessary because Danielle's current SEIT did not provide her with academic assistance, plaintiffs contend that testimony in the record from Danielle's SEIT contradicts this finding. Defendants also note that educational specialists observing Danielle had concluded that the services of a paraprofessional would meet her needs.

The New York Department of Education describes the support provided by a special education teacher as "specially designed and/or supplemental instruction" which may include "adapting the content being taught or using different instructional methods such as visual aids, highlighted work sheets, and simplifying directions." NYCDOE, Continuum of Services at 8. Behavioral management paraprofessionals, in contrast, may be assigned if a child's behavior is dangerous to himself or others and "to help adapt tasks and assignments, and provide reinforcement and small group instruction." Id. at 12.

In this case, the Court's review of the record supports a finding that the services of a paraprofessional are appropriate to meet Danielle's needs. The record contains ample testimony,

credited by the SRO, that Danielle's primary deficiencies are not her inability to understand academic concepts but rather her lack of organizational and focusing skills, and the effects those deficiencies may have on her learning. Danielle's SEIT, for example, offered extensive testimony that she assists Danielle with redirection, refocusing, organization, managing her behaviors and developing social skills. (See Tr. 548, 552-53, 577.) The SEIT notes that Danielle is bright and performing at grade level, but struggles with social interactions and organizational skills. (Tr. 561-62.) Testing by the district's neuropsychologist confirms Danielle's high level of intellectual functioning as well as her deficits in her attention, social skills, and communication. (Def. Exh. 4.) The SEIT specifically stated that socialization was Danielle's biggest challenge, and district representatives did not observe the SEIT providing academic instruction during their visits. (Tr. 79-80; 627.) The district's social worker concluded, after observation, that the SEIT primarily provided "refocusing, redirection, and encouragement to develop social skills." (Def. Exh. 5.)

District representatives also testified that behavioral management paraprofessionals are appropriately trained and have the ability to refocus Danielle and help her improve her behaviors, organizational skills, and social development. According to the testimony of Ellen Quigley, paraprofessionals are trained in behavior management and are made aware of the needs of the child before beginning their work. (Tr. 345.) They also meet with supervisors and the child's classroom teacher to assess the child's progress. (Tr. 344-45.)

Plaintiffs object to the SRO's finding that Danielle does not receive academic assistance from her SEIT. The Court notes that some evidence in the record indicates that Danielle's teachers provided her with academic assistance. Danielle's general education teacher testified

that Danielle has a difficult time grasping mathematical concepts, which are compounded by her lack of focus. (Tr. 883-84.) She additionally testified that Danielle's SEIT instructed her in writing, helping her with sentence structure and punctuation. (Tr. 893.) Additionally, Danielle's general education teacher testified that the SEIT provided instruction "especially in math." (See Tr. 897.) This testimony, however, must be viewed together with the considerable evidence in the record indicating that Danielle's primary deficiencies are behavioral, related to her inability to focus and lack of social and organizational skills. The record, considered in its entirety, does not support a finding that the district's decision to provide a full-time behavior management paraprofessional to Danielle was not reasonably calculated to confer educational benefits.

Plaintiffs' arguments are persuasive that the ideal program for Danielle includes a slow transition from full time SEIT services to a supervised behavior management paraprofessional. However, IDEA, requires that a student receive a "basic floor of opportunity," not "provide the optimal level of services, or even a level that would confer additional benefits." Cerra, 427 F.3d at 195 (citation omitted). In view of this standard, and the record below, the Court cannot conclude that the SRO's decision to uphold the district's recommendation to change Danielle's services from a full time SEIT to a behavior management paraprofessional deprived her of a "basic floor of opportunity" or was likely to cause her to regress academically. Accordingly, the Court concludes that the 2005 IEP's provision for a full-time behavior management paraprofessional did not deprive Danielle of a FAPE pursuant to 20 U.S.C. § 1412(a)(1)(A).

### (2) Transitional Services

Plaintiffs also argue that the school district is required to provide Danielle with transitional services pursuant to 8 N.Y.C.R.R. § 200.13(a)(6), and request that

paraprofessional services be slowly phased into Danielle's plan. Section § 200.13(a)(6) provides: "where a student has been placed in programs containing students with other disabilities, or in a regular class placement, a special education teacher with a background in teaching students with autism shall provide transitional support services in order to assure the student's special education needs are being met." Id. The SRO held, that transitional services are required only when an autistic child is initially placed in the general classroom environment. Because Danielle has had SEIT services for over three years since her transition, defendants argue that further services are not required. Plaintiffs contend that 8 N.Y.C.C.R.R. 200.13 should not be interpreted to limit the requirement for transitional services only to the initial transition into a regular class placement.

The Court is unpersuaded by plaintiffs' interpretation of N.Y.C.C.R.R. Section 200.13. Danielle transitioned into a mainstream classroom with the services of an SEIT in kindergarten; she has remained in mainstream classrooms with SEIT services since that time. The plain language of Section 200.13 has been satisfied; Danielle was provided with transitional support services as she was moved into a mainstream classroom. The Court concurs with the findings of the SRO that "in essence, the child has had a transition component as part of her recommendations for the past three years." (SRO Decision at 11.)

(3)     **Functional Behavioral Assessment**

Plaintiffs also contend that defendants' failure to conduct a functional behavioral assessment ("FBA") denied Danielle a FAPE. According to plaintiffs, the SRO employed the wrong standard in determining whether to conduct an FBA and ignored evidence suggesting one was appropriate. Plaintiffs argue that because Danielle's behavior impedes her learning, the

CSE was required to conduct a FBA pursuant to 8 N.Y.C.R.R. 200.199.  The SRO concluded

that Danielle did not require an FBA because her behaviors responded to redirection and did not

therefore impede her learning.  (See SRO Decision at 9 ("Respondent's representatives who

were familiar with this child each testified that under the circumstances presented with this case,

an FBA was not needed.").)  Defendants also noted that Danielle's SEIT did not ask the CSE to

conduct an FBA.

A CSE must conduct an FBA "for a student whose behavior impedes his or her learning

or that of others, as necessary to ascertain the physical, mental, behavioral and emotional factors

which contribute to the suspected disabilities."  8 N.Y.C.R.R. §200.4(b)(v); see also 20 U.S.C.

§ 1414(d)(3)(B)(i) (The IEP team must, "in the case of a child whose behavior impedes the

child's learning or that of others, consider the use of positive behavioral interventions and

supports, and other strategies, to address that behavior."); 8 N.Y.C.R.R. § 200.4(d)(3)(i).  An

FBA is:

> the process of determining why the student engages in behaviors that impede learning
> and how the student's behavior relates to the environment. The functional behavioral
> assessment shall be developed consistent with the requirements in section 200.22(a) of
> this Part and shall include, but is not limited to, the identification of the problem
> behavior, the definition of the behavior in concrete terms, the identification of the
> contextual factors that contribute to the behavior (including cognitive and affective
> factors) and the formulation of a hypothesis regarding the general conditions under which
> a behavior usually occurs and probable consequences that serve to maintain it.

8 N.Y.C.R.R. § 200.1(r).  Based on the information collected in an FBA, a behavioral

intervention plan is designed pursuant to 8 N.Y.C.R.R. §200.22(b).

The evidence in the record supports a finding that Danielle's behaviors impede her

learning such that an FBA is required by law.  One of Danielle's evaluators, Karen McKeever,

testified that she engages in self-stimulatory activity and is hyper-active.  (Tr. 388-89.)  Mrs.

McKeever additionally testified that Danielle's listening comprehension is likely affected because "she needs to be brought back" from being lost in her own thoughts and finger play. (Tr. 404-05.) Ms. McKeever observed that "[Danielle] does her play, she's busy processing and thinking about other things. So when things are not particularly of interest to her, when things are not challenging, she's not necessarily paying that much attention. And this is, basically, you know, vocabulary." (Tr. 405.) Even though the record reflects that Danielle's listening comprehension scores were average for her grade level, Ms. McKeever's testimony clearly demonstrates that Danielle's behaviors impede her ability to learn and achieve greater academic success.

Danielle's SEIT also testified as to how her behaviors interfere in the classroom. She notes that Danielle is inconsistent and erratic, only raising her hand if prompted in the classroom. (Tr. 545.) She may scream out at the teacher when asked a question (Tr. 551). Danielle's SEIT also testified regarding Danielle's stimulatory behaviors, explaining that Danielle may engage in finger play during class until the point where she's bleeding. (Tr. 552). Additionally, the SEIT testified that Danielle displays tantrumming behavior that the SEIT manages with a variety of methods, and sometimes Danielle's behaviors stem from her inability to complete assignments from the blackboard. (Tr. 555-56, 563.) The SEIT also testified that Danielle has difficulty retrieving and organizing her books. (Tr. 561-62.)

In view of this testimony, the Court finds that Danielle's behavior interferes with her ability to learn as contemplated by 8 N.Y.C.C.R.R. §200.4(b)(v) and 20 U.S.C. § 1414(d)(3)(B)(i). Both Danielle's SEIT and the district's evaluator suggest that Danielle could be achieving at a higher level if her behaviors were managed. The CSE was required to conduct

an FBA to determine the factors that contribute to Danielle's interfering behaviors.

### (4)     Other Areas of Deficit

Plaintiffs allege that the 2005 IEP fails to address and set goals for improvements in Danielle's organizational skills deficits, toileting needs, and tantrumming.  According to the plaintiffs, the SRO incorrectly held that the IEP was not required to address these needs because they could be managed by her paraprofessional.  Plaintiffs argue that the paraprofessional will not know that she needs to address these issues or how to address them if they are not listed on the IEP.  They also claim that this portion of the IEP defeats the IDEA's purpose to foster independence by relying on the paraprofessional to accommodate Danielle's organizational and toileting needs instead of requiring the IEP to provide goals to teach Danielle to overcome these needs.

An IEP must include "a statement of measurable annual goals, including academic and functional goals, designed to [] meet the child's needs that result from the child's disability."  20 U.S.C. § 1414(d)(1)(A)(i).  See also 34 C.F.R. 300.347 ("The IEP for each child with a disability must include [] a statement of measurable annual goals, including benchmarks or short term objectives, related to (i) Meeting the child's needs that result from the child's disability to enable the child to be involved and progress in the general curriculum . . . ; and (ii) Meeting each of the child's other educational needs that result from the child's disability."); 8 N.Y.C.C.R.R. 200.1(ww) ("The individual needs of a student shall be determined by a committee on special education . . . upon consideration of the present levels of performance and expected learning outcomes of the student. Such individual-need determinations shall provide the basis for written annual goals. . . ."); see also Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 53 (2005) ("Each

IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide.")  Furthermore, as discussed above, CSE is required to consider a child's managerial and behavioral needs, as well as her social and physical development, in creating an IEP.  Walczak, 142 F.3d at 122-23.

### (i)    Organizational Skills

The Court finds that Danielle's 2005 IEP was required to specify organizational goals. Ample testimony in the record supports a finding that Danielle had deficiencies in organizational skills.  The district's neuropsychologist, who examined Danielle, testified that Danielle:

> [h]as a deficit in visual processing.  Spatial reasoning.  And this is also seen in the executive functioning when it comes time to process and organize that information.  It's, you know, it's very technical, but this, this is where the child functions neuro-psychologically.

(Tr. 401.)  Danielle's SEIT testified that her organizational skills are "very poor," and discussed the ways in which she worked with Danielle to improve her organizational skills.  (Tr. 561-64.) Danielle's general education teacher testified that she has "no organizational skills on her own." (Tr. 884).  The teacher went on to state that she believed Danielle needed to be taught how to organize for herself, rather than accommodating her lack of organizational skills. (Tr. 885.) Danielle, in the teacher's estimation, is not performing up to grade level with regards to her organizational skills.  (Tr. 888.)  Danielle also scored in the bottom 2-5% in an evaluative test designed to measure organizational skills, among other abilities.  (See Def. Exh. 4.)  There is objective evidence in the record to support a finding that Danielle would not be likely to progress absent a program addressing her organizational deficiencies.

The language of IDEA states that an IEP must in include a statement of goals "designed

to [] meet the child's needs that result from the child's disability."  20 U.S.C. § 1414(d)(1)(A)(i).

As demonstrated above, the record supports a finding that Danielle's disability creates a need for

assistance in developing and maintaining organizational skills; the defendants' own witnesses

concede as much. Those needs should have been addressed in Danielle's IEP through articulated

goals and benchmarks, as required by 20 U.S.C. Section 1414 and the accompanying regulations

in effect when her 2005 IEP was designed.  See also 34 C.F.R. 300.347.  In view of extent of

Danielle's deficiency and the relevant statutory language, the SRO's conclusion that Danielle's

organizational deficiencies may be addressed by the behavioral management paraprofessional

without listed goals is flawed.  Without specific goals to improve Danielle's undisputed

organizational deficiencies, the IEP is not likely to produce progress in Danielle.[3]

### (ii)  Toileting

The Court concludes that Danielle's 2005 IEP was not required to have specific toileting

goals.  Danielle's 2005 IEP indicates that she suffers from kidney reflux disease and that she is

not fully toilet trained (2005 IEP at 1, 7.)  However, as noted by the SRO, the district's social

worker indicated that he did not observe any toileting issues during his observations of Danielle,

and further testified that Mrs. G had informed him that Danielle's toileting accidents were

infrequent. (Tr. 134-35.)  The SEIT's report also indicated that Danielle's toileting skills had

greatly improved.  (Def. Exh. J at 2.)  Although Danielle's SEIT testified that she was not

completely toilet trained, there is not sufficient evidence in the record to support a finding that

Danielle's toileting issues were considerable, such the 2005 IEP was not "reasonably calculated"

to confer educational benefits on Danielle because of its omission of toileting goals.

---

[3]     The Court notes that Danielle's most recent IEP for 2007 includes goals in
organizational skills.

### (iii)     Tantrumming

The Court concludes that Danielle's 2005 IEP was not required to have specific goals addressing Danielle's tantrumming behavior.  Although there is some evidence in the record that Danielle continues to have tantrums, particularly the testimony of Danielle's SEIT and her mother, the Court does not find sufficient "objective evidence" to support a finding that Danielle will regress absent tantrumming goals.  See Cerra, 427 F.3d at 195 ("In order to avoid 'impermissibly meddling in state educational methodology,' a district court 'must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan.'" (quoting Walczak, 142 F.3d at 130 (internal quotation marks omitted)).  The SRO's examination of the record resulted in a finding that Danielle's tantrumming largely did not occur during school hours and did not appear to interfere with her learning.  (SRO Decision at 13.)  In view of the limited evidence in the record to support a finding that Danielle will regress, the state agency's evaluation of Danielle's progress is due deference in view of its "special expertise."  Cerra, 427 F.3d at 195.  Accordingly, the Court concludes that Danielle's 2005 IEP was not required to include tantrumming goals.

### (5)     Length of Service

Danielle's 2005 IEP recommends that her program of services be reduced from twelve to ten months.  Plaintiffs contend that the SRO failed to consider evidence indicating Danielle requires a twelve month program. They argue that the SRO relied on the testimony of the defendants' witnesses, who only had limited experience with Danielle, to determine that Danielle did not experience substantial regression and that twelve month services were, therefore, not required.

New York State regulations require that students shall be considered for 12-month services if, "because of their disabilities, [the students] exhibit the need for a 12-month special service and/or program provided in a structured learning environment of up to 12-months duration in order to prevent substantial regression as determined by the committee on special education." 8 N.Y.C.R.R. § 200.6(j)(1)(v). "Substantial regression" refers to "a student's inability to maintain developmental levels due to a loss of skill or knowledge during the months of July and August of such severity as to require an inordinate period of review at the beginning of the school year to reestablish and maintain IEP goals and objectives mastered at the end of the previous school year." 8 N.Y.C.R.R. § 200.1(aaa).

The Court concludes that the SRO's analysis of regression is supported by the record and should be upheld. The SRO concurred with the finding of the IHO that the record fails to establish that Danielle is likely experience substantial regression during the summer. The SRO concurred with the IHO's finding that the fact Danielle "forgets some of things that she has been taught, or that she needs to make transitions at the beginning of the school year, or that it may be detrimental to her if she does not receive services over the summer, are not sufficient to conclude . . . that the school district's recommendation for a ten month school was not appropriate." (IHO Decision at 30.) The SRO considered testimony from Danielle's SEIT teacher that ten week cessation of services could be "detrimental" to her and her recommendation that services be provided on a twelve month basis. (Tr. 624-25.) The SEIT stated that when Danielle returned to school after a three week break in the summer of 2004, her behavior and academics were affected. (Tr. 617.) However, in its decision, the SRO also noted that the SEIT testified that Danielle recovered from the summer transition in a matter of weeks, as opposed to months (Tr.

618.)  This Court concludes that although the record evidences Danielle's regression during breaks in instruction, there is insufficient testimony to support a finding that she regresses "substantially" such that the ten month recommendation in Danielle's 2005 IEP is in violation of the standard set forth in the IDEA.  In view of the "due weight" that must be afforded the specialized findings by state educational officers, the 2005 IEP's provision for ten months of service may stand.

(6)     Parental Counseling and Training Services

Plaintiffs further allege that the 2005 IEP failed to include parental counseling and training services, and that the defendants' failure to provide training services before August 23, 2006 requires compensatory services.  The SRO did not address the issue because he considered it settled, noting that the defendants had agreed to provide the requested services.

In its response to plaintiffs' motion, the defendants concede that the parental counseling and training services were not provided as a result of "a communication error."  (Def. Reply Br. at 9.)  Defendants also argue the issue is now moot because Mr. and Mrs. G began receiving parental training services on August 23, 2006, and defendants have agreed to provide services dating back to January 6, 2006 (Def. Reply. Br. at 8.)  Plaintiffs assert that the issue is not moot because similar conduct is likely in the future and that the parental services, which they began to receive, have not been formally included as part of Danielle's IEP and, moreover, were "grossly inappropriate."

As an initial matter, the Court notes that the issue of defendants' provision of parental training and counseling is not necessarily moot because services are now being provided.  The Second Circuit has recognized that "alleged deficiencies in the IEP were capable of repetition as

to the parties before it yet evading review" because of the length of time required for judicial review of IEP proceedings. <u>Lillbask v. State of Conn. Dep't of Educ.</u>, 397 F.3d 77, 85-89 (2d Cir. 2005) (quoting <u>Rowley</u>, 458 U.S. at 186 n. 9). The Court also rejects defendants' argument that the issue was waived because plaintiffs failed to file a reply to the SRO that rebutted defendants' inaccurate statement that the matter was settled, pursuant to 8 N.Y.C.C.R.R. §279.6. Regardless of whether plaintiffs may have been obligated to submit a reply brief on the issue of mootness, the SRO appears to have declined consideration of the issue because of defendants' representations on settlement, and not because of plaintiffs' failure to file a reply brief. (<u>See</u> SRO Decision at 10 ("This element of petitioner's appeal is not addressed herein in light of the parties' settlement of this issue.")

However, the Court notes that, in this case, the defendants have conceded that services were not provided during the 2004-2005 school year in error, have resumed service provision, and have agreed to provide services dating back to January 6, 2006. To the extent plaintiffs' seek a statement that the defendants were required to provide parental counseling to Danielle's parents pursuant to the mandatory language of 8 N.Y.C.C.R.R. Section 200.13(d), the Court finds that such counseling was required. <u>See</u> 8 N.Y.C.C.R.R. 200.13(d) ("Provision shall be made for parent counseling and training as defined in section 200.1(kk) of this Part for the purpose of enabling parents to perform appropriate follow-up intervention activities at home.") The Court additionally finds that the parental counseling services provided to Danielle's parents should have been detailed in Danielle's 2005 IEP pursuant to 34 C.F.R. § 300.347(a)(3), which states that an IEP must contain "[a] statement of the special education and related supplementary services to be provided to the child, <u>or on behalf of the child.</u>" (emphasis added). The section

further states at (a)(6) that an IEP is to include "the projected date for the beginning of services . . . and the anticipated frequency, location, and duration of those services."  From a review of the factual account of cases involving IDEA, it appears parental counseling and training services are often included in IEPs.  See, e.g., W.S. ex rel. C.S. v. Rye City Sch. Dist., 454 F.Supp.2d 134, 141, 143 (S.D.N.Y. 2006); M.K. ex rel. Mrs. K. v. Sergi, 554 F.Supp. 2d 233, 244 (D.Conn. 2008); D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist., 348 F.Supp. 2d 92 (S.D.N.Y. 2004) rev'd on other grounds 430 F.3d 595 (2d Cir. 2005).

However, to the extent that plaintiffs seek a finding that the provider chosen by the district for parental counseling was unqualified, that issue is not properly before this Court as the adequacy of the counseling has not been challenged in state review proceedings.

<u>CONCLUSION</u>

For the reasons set forth above, plaintiffs' motion for summary judgment is granted in part and denied in part. The Court find that Danielle's 2005 IEP was required to include goals for her organizational skills, should have included provisions for parental counseling and training, and that a functional behavioral analysis should have been performed to analyze the way in which her behaviors interfere with her academic achievement. The Court also finds that Danielle's 2005 IEP was procedurally sound, and was not required to include provisions for SEIT services, a transition plan, and toileting and tantrumming goals. The record also supports a finding that Danielle's services may be reduced to 10 months. Accordingly, defendants' motion for summary judgment is also granted in part and denied in part.

The Clerk of the Court is directed to enter judgment and to close the case.

SO ORDERED.

Dated: Brooklyn, New York
      August 7, 2008


                                        Carol Bagley Amon
                                        United States District Judge